UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re THOMAS HORNY
And NORMA HORNY,

       Debtors,
                                               Case Number 11-12508-BC (Appeal)
THOMAS W. MCDONALD, JR.,           Honorable Thomas L. Ludington

       Appellant,
                                               Bankruptcy Case Number 11-20024
v.

CREDIT ACCEPTANCE CO.,

       Appellee.
_____ /

**OPINION AND ORDER AFFIRMING BANKRUPTCY COURT DECISION**

      This case presents the question of how high a bankruptcy court may adjust the rate of "cram down" interest above the prime rate in a Chapter 13 proceeding. The bankruptcy trustee appeals the bankruptcy court's decision to increase the interest rate about twelve percent over prime, contending that the plurality opinion in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2003), imposes a fixed ceiling at three percent over prime. This Court, recognizing that the Supreme Court has provided ample material for different points of view on this issue, concludes that *Till*'s "prime-plus" formula does not proscribe an interest rate higher than three percent over prime, if such a rate is necessary to account for the risk of nonpayment and is not too high for the plan to succeed. Rather, the maximum allowable rate is determined by the interplay between the respective requirements of paragraphs five and six of 11 U.S.C. § 1325(a), as applied to the particular facts of the case. Here, the parties agree that the interest rate selected by the bankruptcy court is necessary to adequately compensate the secured creditor for the risk of future

nonpayment, but not too high for the plan to succeed. Therefore, the decision of the bankruptcy court is affirmed.

## I.

On December 30, 2010, Norma Horny purchased a 2002 Buick Rendezvous for a little more than sixteen thousand dollars. About eleven thousand dollars of the purchase price was financed by a loan from Appellee Credit Acceptance Corp. ("Creditor"). Mrs. Horny agreed to an annual interest rate of 23.99 percent, pledging the vehicle as collateral. In her loan application, Mrs. Horny listed her monthly income as $1,700 (this was, she now acknowledges, an overstatement of $274 per month).

Less than a week after purchasing the vehicle, Mr. and Mrs. Horny ("Debtors") filed for Chapter 13 bankruptcy. The Debtors' petition coversheet reflects that this was not the first time that Debtors had filed bankruptcy. Several years earlier, they received a discharge in bankruptcy case number 99-20223, presided over by Bankruptcy Judge Daniel Opperman. Judge Opperman also presided over, and dismissed, a subsequent bankruptcy filing of the Debtors (case number 06-20837).

On January 5, 2011, the Debtors filed a statement of current monthly income that reflected $4,078.19 of household income. On or about the same date, the Debtors filed their proposed Chapter 13 plan of reorganization. The liquidation analysis reflected no possibility of repayment to the unsecured creditors. The Debtors proposed to contribute $1,320.00 of their monthly income to the plan, which over the term of the plan would pay $600.68 to the unsecured creditors, whose claims amounted to $81,239.32. The Debtors proposed to pay the Creditor pursuant to the terms of the loan agreement, including the 23.99 percent interest rate outside the

plan. The bankruptcy trustee, Appellant Thomas McDonald ("Trustee"), objected to the payment of the Creditor's claim outside the plan.

The Debtors then filed an amended plan, proposing instead to pay the Creditor's claim inside the plan. The amended plan reflected that the Creditor's claim was $11,644; it did not identify an interest rate. The amended plan proposed that the Debtors would contribute $1,925 of their monthly income to the plan. Consequently, the unsecured creditors' recovery would increase from $600.68 over the life of the plan to $1,195. Under both the initial and amended plans, the total amount payable to unsecured creditors was less than 1 percent of their claims. The Trustee then suggested an interest rate on the Creditor's claim of 4.25 percent (one percent over the prime rate of 3.25 percent). The Creditor objected.

The morning of the confirmation hearing, the respective counsel of the Debtors and the Creditor agreed to a 15.2 percent interest rate on the Creditor's claim. The Trustee refused to approve the settlement, however, and argued to Bankruptcy Judge Daniel Opperman that under *Till* the appropriate interest rate should be "prime plus one," or 4.25 percent. The Creditor objected, arguing that under *Memphis Bank & Trust v. Whitman*, 692 F.2d 427 (6th Cir. 1982), the contract rate of 23.99 percent should apply. Judge Opperman took the matter under advisement and invited supplemental briefing on the issue.

On May 12, the case was reconvened. After hearing from counsel, Judge Opperman ruled from the bench, stating in pertinent part:

> In accordance with the Supreme Court's decision in *Till v SCS Credit Corp.*, and the subsequent opinion of the 6th Circuit Bankruptcy Appellate Panel in *In re Taranto*, this Court applies the prime plus formula . . . .
>
> Under the facts of this case, however, the Court concludes that the traditional prime plus rate will not adequately compensate Credit Acceptance for its risk with this loan, a loan which had no payment history prior to this bankruptcy being filed. Further, the timing of this loan and the discrepancy

> between the debtor's credit application and her schedules support a finding of increased risk with this loan. Moreover, the facts of this case are truly unusual, and therefore, the circumstances of the bankruptcy case as identified by the United States Supreme Court in *Till* . . . dictate a much higher interest rate.
>
> In particular, the filing of the instant Chapter 13, six calendar days and just a few business days after the loan, caused the Court to set the interest rate much higher than the 300 basis points over the prime rate as urged by the debtor and the trustee. The market risk to Credit Acceptance, which is no timely payment whatsoever with this loan, coupled with a loan that is known to be non-performing less than one week after closing, is extremely and markedly higher.
>
> Under *Till,* this Court is obligated to select a rate high enough to compensate the creditor for its risk. And this Court determines that the previously negotiated 15.2 [percent] is the appropriate rate under these unusual circumstances. Neither . . . the debtors or the trustee have argued that the interest rate would doom the plan and the facts do not support this.

Hr'g Tr. 12:14–17, 15:14–16:15, May 12, 2011, *attached as* Appellee's Br. Ex. 9, ECF No. 9-9.

The Trustee timely noticed his appeal from the decision to this Court.

## II.

"In a bankruptcy proceeding, the bankruptcy court is the finder of fact." *In re Issaacman*, 26 F.3d 629, 631 (6th Cir. 1994) (citing *In re Caldwell*, 851 F.2d 852, 857 (6th Cir. 1988)). Consequently, "a district court reviews the bankruptcy court's findings of fact under the clearly erroneous standard but reviews de novo the bankruptcy court's conclusions of law." *Id*. (citing *In re Zick*, 931 F.2d 1124, 1126 (6th Cir. 1991)).

## III.

Under Chapter 13 of the Bankruptcy Code (specifically, under paragraph five of 11 U.S.C. § 1325(a)), a proposed debt adjustment plan will qualify for court approval only if it accommodates all "allowed secured creditors" in one of three ways:

> (1) by obtaining the creditor's acceptance of the plan; (2) by surrendering the property securing the claim; or (3) by providing the creditor both a lien securing the claim and a promise of future property distributions (such as deferred cash

payments) whose total "value, as of the effective date of the plan, . . . is not less than the allowed amount of such claim."

*Till v. SCS Credit Corp.*, 541 U.S. 465, 468 (2003) (footnote omitted) (quoting 11 U.S.C. § 1325(a)(5)(ii)). "The third alternative," the Court explains, "is commonly known as the 'cram down option' because it may be enforced over a claim holder's objection." *Id*. at 468–69. The text of the "cram down provision" requires that the court confirm the debtor's plan if "with respect to each allowed secured claim . . . the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." § 1325(a)(5)(ii).[1] Significantly, this section does not define "value."

Under paragraph six of § 1325(a), the court may only confirm a proposed plan if "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). Thus, a bankruptcy court "[may] not approve a plan unless it is clear that the debtor will be able to make these payments . . . . Unless the Court has first ascertained that the

---

[1] As an aside, it should be noted that, as the parties agree that the present value of the vehicle exceeds the amount of the Creditor's claim, this case does not implicate the "hanging paragraph" following § 1325(a)(9). The Sixth Circuit explains how the evocatively named "hanging paragraph" came to be thus:

> Prior to Congress's enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a Chapter 13 debtor who still owed money on an automobile could, over the creditor's objection, keep the vehicle and "bifurcate" . . . the creditor's fully secured claim into a secured portion and an unsecured portion under § 506(a)(1). The debt was secured up to the present value of the vehicle, while the remainder of the debt was unsecured, with payments to be distributed, pro rata, among the debtor's unsecured creditors. . . .
>
> However, it seems to be undisputed that Congress viewed this use of "cramdown" as abusive and unfair to car lenders and other lienholders, so when it enacted BAPCPA in 2005, it added an unnumbered paragraph — commonly referred to as the "hanging paragraph" — to the end of § 1325(a). . . .
>
> [T]he "hanging paragraph" applies when: (1) the creditor holds a purchase money security interest securing the debt that is the subject of the claim; (2) the debt was incurred within the 910-day period preceding the date of the filing of the petition; and (3) the collateral for that debt consists of a motor vehicle acquired for the personal use of the debtor.

*Shaw v. Aurgroup Fin. Credit Union*, 552 F.3d 447, 451–52 (6th Cir. 2009) (internal citations and quotation marks omitted).

plan of repayment is feasible[,] . . . the plan cannot be confirmed." *In re Hammonds*, 729 F.2d 1391, 1394–95 (11th Cir. 1984); *but cf. Till*, 541 U.S. at 493 (Scalia, J., dissenting) ("Chapter 13 plans often fail. I agree with petitioners that the relevant statistic is the percentage of *confirmed* plans that fail, but even resolving that issue in their favor, the risk is still substantial. The failure rate they offer — which we may take to be a conservative estimate, as it is doubtless the lowest one they could find — is 37%." (citing Marjorie Girth, *The Role of Empirical Data in Developing Bankruptcy Legislation for Individuals*, 65 Ind. L.J. 17, 40–42 (1989)).

Plans electing to cram down claims generally do not pay the claim in a lump sum. Rather, the plans "often provide for installment payments over a period of years rather than a single payment. In such circumstances, the amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim." *Till*, 541 U.S. at 469. That is, interest must be added — but how much?

In *Till*, the Court granted certiorari to resolve a four-way circuit split on this question. The proper manner of calculating present value, however, proved divisive for the justices as well. Unable to agree, a 4-1-4 plurality decision resulted.[2] First, all nine members of the Court rejected the "coerced" or "forced loan" method used by the court below, which "focus[es] on the interest rate that the creditor in question would obtain in making a new loan in the same industry to a debtor who is similarly situated, although not in bankruptcy." *Id*. at 472 (internal quotation marks omitted) (quoting *In re Till*, 301 F.3d 583, 592 (7th Cir. 2002)). Likewise, all nine

---

[2] Justice Stevens announced the judgment of the Court and authored an opinion joined by three fellow justices (Breyer, Ginsburg, and Souter). Justice Thomas concurred in the judgment, writing separately. And Justice Scalia dissented, joined by Chief Justice Rehnquist and Justices Kennedy and O'Connor.

justices rejected the "cost of funds method," which "charg[es] an interest rate equal to the creditor's borrowing rate." *In re Till*, 301 F.3d at 589, *rev'd sub nom. Till v. SCS Credit Corp.*, 541 U.S. 465 (2003). And five justices rejected "the presumptive contract rate approach" endorsed by Justice Scalia's four-justice dissent. This approach, as its name suggests, begins with a presumption that the interest rate in the parties' contract applies and then permits the debtor to introduce "information about the creditor's costs of overhead, financial circumstances, and lending practices to rebut the presumptive contract rate." *Till*, 541 U.S. at 478; *see also id*. at 492 (Scalia, J., dissenting).

Instead, Justice Stevens's four-justice plurality opinion adopted the "prime-plus" or "formula rate," explaining:

> Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Id*. at 478–79 (plurality opinion) (footnote omitted). As an empirical matter, the plurality noted, under the prime-plus approach "courts have generally approved adjustments of 1% to 3%." *Id*. at 480 (citing *In re Valenti*, 105 F.3d 55, 64 (2d Cir. 1997) (collecting cases)). The plurality declined, however, to "decide the proper scale for the risk adjustment," concluding:

> It is sufficient for our purposes to note that, under 11 U.S.C. § 1325(a)(6), a court may not approve a plan unless, after considering all creditors' objections and receiving the advice of the trustee, the judge is persuaded that "the debtor will be able to make all payments under the plan and to comply with the plan." Together with the cramdown provision, this requirement obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to

>   necessitate an eye-popping interest rate, the plan probably should not be confirmed.

*Id*. at 480–81 (internal citations and quotation marks omitted) (quoting § 1325(a)(6)).

Justice Thomas concurred in the judgment, writing separately to express his opinion that the "plus" factor in the prime-plus formula is unnecessary, elaborating:

>   I agree that a "*promise* of future payments is worth less than an immediate payment" of the same amount, in part because of the risk of nonpayment. But this fact is irrelevant. The statute does not require that the value of the *promise* to distribute property under the plan be no less than the allowed amount of the secured creditor's claim. It requires only that "the value of *property* to be distributed under the plan," at the time of the effective date of the plan, be no less than the amount of the secured creditor's claim. . . . [T]he statute that Congress enacted does not require a debtor-specific risk adjustment.

*Id*. at 486–87 (Thomas, J., concurring) (internal citation and alteration omitted) (quoting § 1325(a)(5)(B)(ii); *In re Till*, 301 F.3d at 593 (Rovner, J., dissenting)). "In most, if not all, cases, where the plan proposes simply a stream of cash payments, the appropriate risk-free rate should suffice," Justice Thomas concluded.[3]  *Id*. at 487. He nevertheless concurred in the plurality's judgment as the narrow legal issue before the Court was whether an interest rate of prime plus 1.5 percent was sufficient to compensate the creditor. *Id*. at 491.

Justice Scalia's four-justice dissent, in contrast, agreed with Justice Stevens's plurality that a debtor-specific risk adjustment is appropriate. "We agree," Justice Scalia wrote, "that any deferred payments to a secured creditor must fully compensate it for the risk that such a failure

---

[3] As an analytical matter, Justice Thomas's position is in considerable tension with the traditional composition of an interest rate, which "has three main components. The first is opportunity cost of capital net of any risk of loss and of any expectation of inflation (or deflation). The second is risk premium necessary to compensate the investor for the possibility that he will never get his capital back . . . . The third is the anticipated inflation rate over the period in which the loan will be outstanding." Richard Posner, *Economic Analysis of Law* 194–95 (6th. ed. 2003). As discussed above, Justices Stevens and Scalia agree that the first two components must be a part of the interest rate calculus; they disagree on how best to make the calculation. Justice Thomas, in contrast, believes that the prime rate is sufficient — no additional risk premium is necessary. This view does not address the fact that the prime rate itself incorporates a risk premium; it is not simply a function of the expected inflation rate. Put differently, if the secured party is not entitled to any risk premium, the payments should be pegged simply to the expected rate of inflation, not to the prime rate.

will occur." *Till*, 541 U.S. at 491 (Scalia, J., dissenting). He continued, "[W]e agree that adequate compensation may sometimes require an 'eye-popping' interest rate, and that, if the rate is too high for the plan to succeed, the appropriate course is not to reduce it to a more palatable level, but to refuse to confirm the plan." *Id*. "Our only disagreement," Justice Scalia concluded, "is over what procedure will more often produce accurate estimates of the appropriate interest rate." *Id*.

In sum, eight justices in *Till* agreed that the secured creditor is entitled to an interest rate sufficient to compensate for the risk of nonpayment, unless the rate is so high as to "doom the plan." *Id*. at 480 (plurality opinion). And, significantly, the eight justices agreed that the bankruptcy court should evaluate whether the interest rate is excessive according to a qualitative standard (whether the interest rate is "eye popping") rather than according to a fixed, quantitative benchmark (such as three percent over prime).

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices," the Court instructs, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). The "narrowest" position, in turn, "refers to the one which relies on the 'least' doctrinally 'far-reaching-common ground' among the Justices in the majority: it is the concurring opinion that offers the least change to the law." *United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) (citing *Johnson v. Bd. of Regents of the Univ. Of Ga.*, 263 F.3d 1234, 1247 (11th Cir. 2001)); *see generally* Ken Kimura, Note, *A Legitimacy Model for the Interpretation of Plurality Decisions,* 77 Cornell L. Rev. 1593 (1992).

Although perhaps not immediately obvious which is the controlling opinion in *Till* (if any),[4] the Sixth Circuit has concluded that Justice Stevens's plurality carries precedential force. *See In re Am. HomePatient, Inc.*, 420 F.3d 559, 566–67 (6th Cir. 2005); *accord Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 349–50 (5th Cir. 2008). In the single Sixth Circuit opinion addressing the issue, a Chapter 11 case, the court notes in dicta that *Till* "is clear that the [prime-plus] formula approach is the preferable method for Chapter 13 cases." *Id*. at 567. Likewise, the Bankruptcy Appellate Panel for the Sixth Circuit endorses the *Till* plurality's prime-plus approach, writing: "This Panel believes that [Justice Stevens's] *Till* rationale remains valid and binding." *In re Taranto*, 365 B.R. 85, 90 (B.A.P. 6th Cir. 2007).

In this case, Judge Opperman applied *Till*'s prime-plus formula, beginning with the prime rate of 3.25 percent and then evaluating the facts regarding risk of nonrepayment posed by the Debtors. Noting that "the facts of this case are truly unusual," Judge Opperman first observed that "the timing of this loan," less than a week before the bankruptcy filing, meant it "had no payment history prior to this bankruptcy being filed." Hr'g Tr. 15:17–18, 15:22. He elaborated: "The market risk to Credit Acceptance, which is no timely payment whatsoever with this loan, coupled with a loan that is known to be non-performing less than one week after closing, is extremely and markedly higher [than the typical case]." Hr'g Tr. 16:6–9. Additionally, Judge Opperman observed, the Debtor reported in her credit application monthly income of $1,700; when she completed her bankruptcy schedules a short time later, however, she reduced her

---

[4] From one perspective, Justice Thomas's concurrence offered a "narrower" legal rule (i.e., simply apply the prime rate), while Justice Stevens's plurality opinion offered a more expansive rule (i.e., apply the prime-plus formula). From another perspective, Justice Stevens's opinion offered a "narrower" doctrinal position — the prime-plus formula was a less dramatic change in the law than Justice Thomas's proposal of "prime only," which none of the circuit courts had adopted. *See generally In re Valenti*, 105 F.3d 55, 64 (2d Cir. 1997) (collecting pre-*Till* cases applying prime-plus approach). Indeed, at least one court has concluded that "the *Till* decision results in no binding precedent" because "[t]he plurality's reasoning shares no common ground with Justice Thomas' inquiry into the statutory text or his conclusion that the text mandates interest at the 'riskless' rate." *In re Cook*, 322 B.R. 336, 343 (Bankr. N.D. Ohio 2005) (emphasis omitted).

monthly income by $274.  "[T]he discrepancy between the debtor's credit application and her schedules," Judge Opperman explained, also "support[s] a finding of increased risk with this loan."  Hr'g Tr. 15:19–21.  And Judge Opperman, it should be noted, was well acquainted with the Debtors from the prior cases.

After evaluating the Debtors' circumstances, Judge Opperman decided that an upward adjustment of a little less than twelve percent over prime was necessary to ensure that the property to be distributed to the Creditor over the life of the plan would have a total value, as of the effective date of the plan, that equaled the value of the Creditor's secured claim.  Turning to the duration and feasibility of the reorganization plan, Judge Opperman observed that neither the Debtors nor the Trustee "argued that the interest rate would doom the plan and the facts do not support this."  Hr'g Tr. 15:13–15.  Consequently, Judge Opperman sustained the Creditor's objection, concluding that 15.2 percent was a proper risk adjustment.

Although a substantial increase, as a factual matter the scale of this adjustment reasonably corresponds to the risk of nonpayment that the Debtors present.  The timing of the loan, less than a week before the bankruptcy filing, suggests that the Debtors pose a substantially greater risk of nonpayment than typical bankruptcy debtors.  Reinforcing this conclusion is the discrepancy in reported income between the credit application and the bankruptcy schedules completed shortly thereafter.  Judge Opperman's findings of fact are not clearly erroneous.

Indeed, the Trustee concedes that he "does not contest any of the Bankruptcy Court's findings of fact."  Appellant's Reply Br. 1, ECF No. 12.  "Rather," the Trustee explains, "he challenges the conclusion that it is ever appropriate, as a matter of law, to confirm a plan where secured debtors need more than three percent interest over the prime rate to secure their collateral."  Id.  The Trustee's bright-line proposal is unpersuasive.

In *Till*, eight justices agreed that the interaction between paragraphs five and six of § 1325(a) creates an implicit upper limit on the interest rate which a bankruptcy court can approve. The former paragraph requires the plan's terms ensure that the secured creditor will receive the present value of its claim; the latter requires the plan's terms also ensure that "the debtor will be able to make all payments under the plan and to comply with the plan." *Till*, 541 U.S. at 480 (quoting 11 U.S.C. § 1325(a)(6)). Rather than attempting to quantify what the upper limit of a permissible interest rate is by assigning one fixed figure as a ceiling (as the Trustee would have this Court do), the eight justices agreed on an "eye-popping" qualitative standard: "If the court determines that the likelihood of default is so high as to necessitate an 'eye-popping' interest rate, the plan probably should not be confirmed." *Id*. at 480–81 (internal citation omitted) (quoting *In re Till*, 301 F.3d at 593 (Rovner, J., dissenting)). Thus, the Trustee's argument that as a matter of law § 1325(a)(6) imposes a firm ceiling at three percent over prime is not supported by the consensus of eight justices in *Till*. If such a bright-line quantitative rule is to be established, it should be established by the Supreme Court or the Sixth Circuit, not this Court. Finding no such instruction from the courts above, this Court concludes that the maximum allowable rate is not a single, fixed number. Rather, it is to be determined by the interplay between the respective requirements of paragraphs five and six of 11 U.S.C. § 1325(a), as applied to the particular facts of the case.

As the Trustee does not challenge Judge Opperman's findings of fact that a 15.2 percent interest rate is sufficient to compensate the Creditor for the risk of future nonpayment, but not too high for the plan to succeed, the decision will be affirmed.

## IV.

The decision of the bankruptcy court is affirmed.

                                                                 /s/Thomas L. Ludington  
                                                                  THOMAS L. LUDINGTON  
                                                                 United States District Judge

Dated: December 21, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 21, 2011.

                                     s/Tracy A. Jacobs  
                                     TRACY A. JACOBS